Barbara Ann **COLLIGNON** and Marc Collignon, Executor of the Estate of Jonathan Collignon, Plaintiffs–Appellants,

v.

**MILWAUKEE COUNTY,** Grace Downing, Joseph Lofy, et al., Defendants–Appellees.

No. 98–1711.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1998.

Decided Dec. 15, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 12, 1999.

984

Lawrence G. Albrecht (argued), First, Blondis, Albrecht, Bangert & Novotnak, Milwaukee, WI, for Plaintiffs–Appellants.

Timothy R. Karaskiewicz (argued), Office of the Corporation Counsel, Milwaukee, WI, for Defendants–Appellees Milwaukee County and Grace Downing.

Gregg T. Heidenreich (argued), Stilp & Cotton, Milwaukee, WI, for Defendants–Appellees Joseph Lofy and Patrick Dunn.

Before FLAUM, MANION, and EVANS, Circuit Judges.

MANION, Circuit Judge.

Jonathan Collignon, like many people with a mental illness, was able to lead a productive life while on his prescribed medication. But when he stopped taking his medication his schizophrenia returned. He was arrested for damaging property and placed in the Milwaukee County Jail. After 17 days, he was released on bail to his parents. Shortly thereafter he was temporarily detained by the Shorewood (Wisconsin) Police Department, who also released him to his parents. The next day he committed suicide. Jonathan's estate and his parents sued Milwaukee County and one of its psychiatrists as well as Shorewood and several of its police officers, claiming that their action or inaction had violated Jonathan's federal constitutional rights, causing him pain and suffering and leading to his suicide. The district court granted judgment on the pleadings for the

Shorewood defendants and granted summary judgment for the County defendants. Because we conclude that the pleadings and record in this case fail to establish any federal constitutional violation, we affirm.

## I. Background

We relate the facts in the light most favorable to the plaintiffs. *See Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 (7th Cir.1998) (summary judgment); *Frey v. Bank One*, 91 F.3d 45, 46 (7th Cir.1996) (judgment on the pleadings). During the spring of 1993 when the events critical to this case took place, Jonathan was a 28–year–old who had a long history of mental illness. Jonathan's treating psychiatrists diagnosed him as suffering from paranoid schizophrenia. While an in-patient at the Milwaukee County Mental Health Center (MCMHC) in February 1992, Jonathan attempted suicide. While Jonathan was taking his prescription medications, his mental illness was controlled and he could lead a productive life. He attended the University of Wisconsin-Milwaukee, where he was a good student and was able to make friends. But Jonathan's medications had side effects he disliked, so he would stop taking them. In August 1992, Jonathan's mental condition had so deteriorated that he was involuntarily committed to MCMHC under Wisconsin's statutory provisions.

In January 1993 Jonathan was released from MCMHC based at least partly on the condition that he would continue to take his medication. But Jonathan soon stopped taking his medication and his mental health deteriorated until on April 5, 1993, he was arrested by the Milwaukee Police Department and charged with criminal damage to property. The police took Jonathan to the Milwaukee County Jail and because of his mental illness and past suicide attempt, the jail staff placed Jonathan on the jail's highest level of suicide watch, which required jail personnel to check on him at least once every 15 minutes.

On April 7, two days after Jonathan entered the jail, the jail's psychiatrist, Dr. Grace Downing, met with him for the first time. Dr. Downing discussed Jonathan's mental health history with him, including his prior suicide attempt and his resistance to taking medications because of their side effects. Dr. Downing decided that because Jonathan was reluctant to take medications, the best course of action was to develop a "therapeutic alliance" with him. She prescribed a non-therapeutic dose of Thorazine (25mg per day). Although Dr. Downing knew such a small dosage would have no effect on Jonathan's schizophrenia, it would also not have the side effects that he so feared. She hoped to cultivate a willingness on his part to eventually take a therapeutic dosage. On April 12, 1993, Dr. Downing had a follow-up meeting with Jonathan. She increased his Thorazine dosage to 50 mg per day, which still was non-therapeutic. (Due to a clerical error by the jail's nursing staff, Jonathan did not receive this medication on three consecutive days: April 19, 20, and 21.)

On April 13, 1993, Jonathan met with psychiatrist George Palermo as part of a court-ordered competency evaluation. Dr. Palermo's report, submitted to the court the next day, concluded that Jonathan suffered from paranoid schizophrenia but that he was nonetheless competent to stand trial. On April 20, the court accepted Dr. Palermo's report and found Jonathan competent. The court set his bail at $200, with the conditions that he continue to take his medication and that he be monitored by Wisconsin Correction Services (WCS), which is a private entity that contracts with Milwaukee County to provide, among other services, bail monitoring and follow-up medical, social, and psychiatric services. On April 22, Jonathan's father, Marc, and his mother, Barbara Ann, posted the required $200 to bail him out. The Collignons met with WCS social worker Linda Hitz, who scheduled a follow-up meeting for the next afternoon.

Before his detention, Jonathan had been living with his father and stepmother, and he went home with them after leaving the jail. Shortly after 6:00 p.m. that evening, the elder Collignon and his wife laid down for a nap. When they awoke a few hours later, Jonathan was gone. They discovered that he had thrown away many of his personal belongings. Jonathan's father and stepmother went to the Shorewood Police and asked for their help in finding Jonathan. They told the

officer on duty about Jonathan's mental health history and his strange behavior that evening. In response, the Shorewood Police posted a missing persons bulletin to about 50 other law enforcement agencies. Around midnight that evening, acting on the bulletin, a University of Wisconsin–Milwaukee police officer, who knew Jonathan from his time at UWM as a student, found Jonathan on campus and took him into custody. Two Shorewood officers came to pick up Jonathan shortly thereafter, and transported him back to the Shorewood Police Department. There, officers interviewed him and released him at about 1:30 a.m. He again went home with his father and stepmother.

The next morning, at about 9:00 a.m., Jonathan's father saw him come downstairs and quickly leave. The elder Collignon ran outside and saw his son walking east. Marc Collignon did not seek the aid of the police as he had done the night before; rather he waited to leave home until about 12:15 p.m. to pick up his wife from work to go to the appointment with WCS. Marc Collignon and his wife apparently believed Jonathan would meet them at WCS for the appointment. But Jonathan never showed up, and Marc and his wife left after waiting about 15 minutes. In the meantime, Jonathan had gone to the Hyatt Regency in Milwaukee and gone up to the eighteenth floor. The Hyatt's guest rooms on each floor surround a central atrium, which is open from the lobby all the way up to the eighteenth floor. Jonathan climbed over the short wall separating him from the atrium and hung over the edge. A hotel employee spotted him and ran towards him calling out for Jonathan to hold on, but before the employee could get to Jonathan he let go and fell to his death. When Jonathan's father and stepmother arrived home that afternoon, they had a message from the Shorewood Police. When they returned the call, a detective came to meet them and informed them of Jonathan's death.

On May 6, 1994, Jonathan's estate and his parents filed this suit against Milwaukee County, Dr. Downing (individually and in her official capacity), the Village of Shorewood, its insurance company, three of Shorewood's police officers (individually and in their official capacities), the Hyatt Regency, and its insurance company. The complaint asserted claims under 42 U.S.C. § 1983 against the County and Shorewood defendants for federal constitutional violations, and asserted Wisconsin statutory and common-law negligence claims against all the defendants. On March 26, 1996, the district court (Judge Reynolds) granted summary judgment to the Hyatt on all the plaintiffs' claims against it, and granted judgment on the pleadings for the Shorewood defendants on the plaintiffs' federal claims. The case was later transferred to Judge Clevert, and on February 18, 1998, the district court granted summary judgment to the County defendants on both the state and federal claims and to the Shorewood defendants on the remaining state law claims. The plaintiffs have not appealed from the district court's rulings regarding their state law claims against any of the defendants. In this appeal, then, we need only address the district court's decision to grant summary judgment for the County defendants and judgment on the pleadings for the Shorewood defendants on the plaintiffs' federal claims.

## II. Analysis

### A. Summary Judgment for the County Defendants

■ Our review of the district court's grant of summary judgment is *de novo*, and we must apply the now familiar standard to determine whether the County defendants are entitled to a judgment as a matter of law. The plaintiffs base their claims against Milwaukee County and Dr. Downing on 42 U.S.C. § 1983, which provides that "[e]very person who, under color of statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . ." The plaintiffs claim that Dr. Downing and Milwaukee County deprived Jonathan, a pre-trial detainee, of his rights under the Fourteenth Amendment, which prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." It is now well settled that pre-trial detainees are protected by the

Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's prohibition against cruel and unusual punishment, which applies only to convicted persons. *See Estate of Cole v. Fromm,* 94 F.3d 254, 259 n. 1 (7th Cir.1996). But the precise scope of the due process protections are not well settled. Thus, we first must determine what the appropriate test under the Fourteenth Amendment is.

■■■■■■ The plaintiffs do not assert that Jonathan received inadequate procedural safeguards before Dr. Downing or Milwaukee County deprived him of life or liberty. Their claims are under the substantive component of the Due Process Clause, that is, they assert that the actions (or inactions) of Dr. Downing and Milwaukee County were in themselves unconstitutional. *See, e.g., Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). In *DeShaney v. Winnebego County Dept. of Social Servs.,* 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Court stated that

> [t]he [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimum levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

The Court held that "[a]s a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. 998. Thus, the plaintiffs cannot base their claims on the assertion that Dr. Downing or Milwaukee County had an obligation to stop Jonathan from committing suicide once he had been released from the jail. *Cf. Archie v. City of Racine,* 847 F.2d 1211, 1221 (7th Cir.1988) *(en banc)* ("[T]he Due Process Clause does not require the state to imprison [insane persons] or protect its citizens from them.") (discussing *Bowers v. DeVito,* 686 F.2d 616 (7th Cir.1982)). Similarly, the plaintiffs cannot claim that the County defendants should have involuntarily committed Jonathan to a mental health facility: Due

process protects people from being unlawfully restrained; it provides no right to be restrained, lawfully or otherwise. *Wilson v. Formigoni,* 42 F.3d 1060, 1066 (7th Cir.1994) ("[T]here is no constitutional right to be deprived of liberty...."). And this case does not present a situation in which the County, by releasing Jonathan on bail, placed him in a position of danger. *See Wallace v. Adkins,* 115 F.3d 427, 429 (7th Cir.1997) (state creates "special relationship" and an obligation to provide protection when it "affirmatively places the individual in a position of danger the individual would not have otherwise faced"). It would present a much different situation than we have here if a state actor "released" a pre-trial detainee by, for example, dumping him in the wilderness. *Cf. Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982) (abandoning a person in a position of danger is no less a tort than to throw him into a "snake pit"). That, of course, is a far cry from what happened here. So whatever liability might attach to the County defendants must be based on actions or inactions taken while Jonathan was in custody.

■■■■■ When a state actor such as Milwaukee County deprives a person of his ability to care for himself by incarcerating him, detaining him, or involuntarily committing him, it assumes an obligation to provide some minimum level of well-being and safety. *DeShaney,* 489 U.S. at 198–200, 109 S.Ct. 998 (discussing *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (Eighth Amendment requires medical care for prisoners)); *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (substantive due process requires State to provide reasonable safety for involuntarily committed person); *Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (substantive due process requires State to provide needed medical care for suspect in police custody). In *Youngberg,* the Court held that the test for determining whether an involuntarily committed person had been provided reasonable safety is whether "professional judgment in fact was exercised [by the State actors]. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." 457 U.S. at

321, 102 S.Ct. 2452 (internal quotation omitted). The Court explained that

> there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions. For these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id.* at 322–23, 102 S.Ct. 2452 (citations and footnotes omitted). We have applied this same standard to the decisions of professionals in the setting at issue here, that is, treatment of a pre-trial detainee's medical needs. *See, e.g., Fromm,* 94 F.3d at 262.

■ The substantive due process standard (in this context we'll call it the professional judgment standard) is at least as demanding as the Eighth Amendment "deliberate indifference" standard. *Fromm,* 94 F.3d at 259 n. 1. The plaintiffs urge us to hold that it is more demanding, but they do not articulate what, as a practical matter, this more demanding standard requires. The plaintiffs correctly note that the deliberate indifference standard and the professional judgment standard arise in substantially different contexts: deliberate indifference analysis looks to identify what conduct amounts to unlawful "punishment" of convicted persons, while the professional judgment analysis looks to identify what conduct falls below a minimum level of care that must be provided to persons such as pre-trial detainees whom the state may not punish at all. But there is minimal difference in what the two standards require of state actors.

■ Both the Eighth Amendment and this limited form of substantive due process require the state to provide to detained, committed, or incarcerated persons minimum levels of the basic human necessities: food, clothing, shelter, medical care, and reasonable safety. *See Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (Eighth Amendment); *DeShaney,* 489 U.S. at 200, 109 S.Ct. 998 (discussing substantive due process and Eighth Amendment); *Youngberg,* 457 U.S. at 324, 102 S.Ct.

2452 (substantive due process). The standard for liability under the Eighth Amendment is deliberate indifference, which is more than negligence and approaches intentional wrongdoing. *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970 ("While *Estelle* establishes that deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."). A comparable standard is applicable to substantive due process' professional judgment standard for detained or committed persons. *Estate of Porter v. Illinois,* 36 F.3d 684, 688 (7th Cir. 1994) (" '[p]rofessional judgement, like recklessness and gross negligence, generally falls somewhere between simple negligence and intentional misconduct'") (quoting *Shaw v. Strackhouse,* 920 F.2d 1135, 1146 (3d Cir. 1990) (alternation by quoting court)). In *Farmer,* the Court concluded that deliberate indifference was essentially a criminal recklessness standard, that is, ignoring a known risk, 511 U.S. at 837, 114 S.Ct. 1970. Although when discussing the professional judgement standard in *Porter* we referred to either recklessness or gross negligence—the terms used by the Third Circuit—we have concluded that gross negligence, while more egregious, is still negligence and thus below the standard needed to impose constitutional liability. *Salazar v. City of Chicago,* 940 F.2d 233, 238 (7th Cir.1991). Only the criminal recklessness standard provides adequate notice of what conduct is or is not permitted; degrees of negligence vary considerably with the facts of each case. *Id; Archie* 847 F.2d at 1219 ("A line that cannot be policed is not worth drawing in constitutional law"). As a practical matter, then, there is little difference between the Eighth Amendment standards regarding the conduct of prison medical professionals' treatment of prisoners' medical needs, and substantive due process' standards regarding the conduct of other medical professionals' treatment of detained or committed persons' medical needs. And certainly the plaintiffs have not tried to articulate any material difference between the two standards. Indeed, the principal difference between the two standards lies with the

type of decisions that each addresses: the professional judgment standard only applies to decisions made by professionals such as physicians, psychiatrists, and nurses within their area of professional expertise, *see Youngberg*, 457 U.S. at 323 n. 30, 102 S.Ct. 2452, while the deliberate indifference standard applies to a variety of decisions made by prison officials, including when to segregate a prisoner to protect him from the violence of others. *See Farmer*, 511 U.S. at 831, 114 S.Ct. 1970; *Soto v. Johansen*, 137 F.3d 980, 981 (7th Cir.1998). But significantly, the deliberate indifference standard also applies to the decisions of prison medical personnel as to what medical care a prisoner requires. *See Estelle v. Gamble*, 429 U.S. at 104, 97 S.Ct. 285; *Gutierrez v. Peters*, 111 F.3d 1364, 1365 (7th Cir.1997).

■■■ In the context of a claim for inadequate medical care, the professional judgment standard requires essentially the same analysis as the Eighth Amendment standard. First, the plaintiff's medical needs must have been objectively serious. *Cf. Gutierrez*, 111 F.3d at 1369. The inadequate treatment of minor medical needs simply does not rise to the level of a constitutional wrong. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir.1996). Second, in order for the plaintiff to show that the state actor's decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment," *Youngberg*, 457 U.S. at 323, 102 S.Ct. 2452, the plaintiff must show: (1) that the professional knew of the serious medical need, and (2) disregarded that need. *Cf. Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. A trier of fact can conclude that the professional knew of the need from evidence that the serious medical need was obvious. *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970. And we can assume that what might not be obvious to a lay person might be obvious to a professional acting within her area of expertise. A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances. *Cf.*

*Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) (under Eighth Amendment analysis, evidence that some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim).

■■ With this standard in mind, we now turn to the merits of the plaintiffs' claims against Dr. Downing and Milwaukee County. Although the plaintiffs make a passing argument regarding the County's policies and practices in an effort to set forth § 1983 liability under *Monell v. Department of Social Servs. of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the plaintiffs' arguments do not articulate what policies or practices they believe violated Jonathan's substantive due process rights. Rather, their arguments against the County merely rely on the assertion that the policies and training inadequacies (whatever they were) caused Jonathan to receive constitutionally inadequate medical treatment while at the jail. Thus, our primary analysis must be whether the conduct of Dr. Downing— who was principally responsible for deciding the course of Jonathan's medical care at the jail—violated Jonathan's constitutional rights. If her treatment was not constitutionally inadequate, the plaintiffs' claims fail against both Dr. Downing and the County.

The threshold requirement is that the plaintiffs show that Jonathan had an objectively serious medical need, and they have met that burden here. From our after-the-fact vantage point, we now know that Jonathan's mental illness was very serious; it not only had caused him to attempt suicide in the past but ultimately caused him to make another attempt that killed him. The second requirement is that the plaintiffs show that Dr. Downing was subjectively aware of Jonathan's serious medical need. In hindsight, we know that Jonathan's condition placed him on the verge of suicide; but hindsight is not the measure of Dr. Downing's conduct. The critical question is what Dr. Downing knew of Jonathan's medical needs and whether she exercised professional judgment in that face of those known needs.

Clearly Dr. Downing knew from her initial conversation with Jonathan that he had a

serious mental illness and posed some risk for suicide. We have no doubt that such knowledge was enough to trigger a constitutional obligation to provide some level of care and treatment while he was a pre-trial detainee. She also knew, however, that Jonathan had an aversion to powerful, effective anti-psychotic medications. She prescribed a nontherapeutic dosage of an anti-psychotic drug (Thorazine) with the intention of forming a "therapeutic alliance" with Jonathan and slowly increasing the dosage so that he could gradually overcome his aversion to the side effects of the medication. The plaintiffs' expert did not dispute that this treatment plan was one that a professional might use in such a situation. But he disagreed with the treatment plan, opining that it would have been better had Dr. Downing ordered Jonathan to be intra-muscularly injected with a large dosage of a powerful anti-psychotic drug, which would have had a therapeutic effect for a period of time. For two reasons (at least) this opinion is simply not enough to overcome summary judgment.

First, this demonstrates a disagreement about which of many professionally acceptable treatment plans should have been implemented. While such a dispute might state a negligence cause of action, it cannot make out a substantive due process claim. *Youngberg,* 457 U.S. at 321, 102 S.Ct. 2452. Second, the plaintiffs' expert conceded that there is no evidence in the record that Jonathan would have voluntarily submitted to such a treatment or would have tolerated the side effects. Thus, the opinion that such an alternative treatment plan would have been more beneficial or even acceptable to Jonathan is pure speculation.[1]

▇▇▇ This case would present a different factual setting if Dr. Downing—or anyone else—had somehow known that Jonathan was on the verge of committing suicide. But the plaintiffs' expert conceded that no one could have predicted Jonathan was about to attempt suicide. Of course a medical professional need not be certain that an individual is about to commit suicide before a constitutional obligation to act is triggered, but the obligation to take some action is not triggered absent a "substantial risk" of suicide. *See, e.g., Haley v. Gross,* 86 F.3d 630, 641 (7th Cir.1996) (under the Eighth Amendment, liability is imposed for ignoring actual knowledge of a substantial risk of serious harm). The plaintiffs rely heavily on the fact that Jonathan was placed on the highest level of suicide watch at the jail. This reliance is misplaced. The substantial risk Jonathan faced was not from a violent third person; rather it was from himself. His jailers prudently eliminated that risk by closely scrutinizing his behavior while he was in custody. Placing him on a high level of suicide watch does not automatically impose on those responsible for the precaution a constitutional obligation to devise a treatment plan premised on the probability that Jonathan was on the verge of suicide. No one can predict suicide with any level of certainty; medical professionals at jails, based on limited information, must decide whether a person is little, some, or a serious risk of suicide. Placing a pre-trial detainee on some level of suicide watch, even the highest level, does not demonstrate a subjective awareness of a substantial risk of imminent suicide. *See Fromm,* 94 F.3d at 261 (expert's disagreement with treating psychiatrist's conclusion regarding the likelihood that a patient would commit suicide does not amount to evidence of deliberate indifference). Suicide watch is not a treatment for a suicidal person: it is a preventative safety measure that may be part of a state actor's constitutional obligation to provide reasonable safety to a detainee. Being placed on suicide watch may save a suicidal person's life not by preventing the desire to attempt suicide, but by prevent-

---

1. On appeal, the plaintiffs seem to offer an alternative theory to get around these clear flaws in their expert's opinions, namely, that even if Dr. Downing's purported treatment plan were a professionally acceptable option, she failed to implement it. For evidence of this, the plaintiffs point to some testimony that the drug Dr. Downing prescribed (Thorazine) has a large number of side effects. Again, this evidence fails to create a triable issue. At best such evidence creates an issue of whether Dr. Downing's treatment plan was negligent. It does not satisfy the plaintiffs' burden to show that no psychiatrist would have prescribed Thorazine as Dr. Downing did in 1993. (The plaintiffs' expert's testimony that several drugs that are now available are superior to Thorazine is hopelessly irrelevant; such testimony has no bearing on the professional choice to prescribe Thorazine prior to the introduction of the "better" drugs.)

ing the attempt from succeeding. At least from the standpoint of the Due Process Clause, it is acceptable for a medical professional to take the safety measure of placing an individual on the highest level of suicide watch while at the same time devising a treatment plan that does not presuppose the person is highly likely to attempt suicide as soon as he is released to his parents. That is the sort of treatment plan the plaintiffs' expert opined should have been put in place for Jonathan. Such an opinion falls far short of showing a violation of Jonathan's substantive due process rights.[2] The County had a duty to provide reasonable safety to Jonathan while he was a pre-trial detainee and to provide for his basic medical needs. In the context of a chronically mentally ill person like Jonathan, that duty is principally one of maintenance rather than cure because, as the plaintiffs' expert explained, Jonathan's schizophrenia could not be cured, only treated in the long term without any guarantee of success. And once Jonathan was released, the County's duty was cut off. *DeShaney*, 489 U.S. at 195, 109 S.Ct. 998.

Because we have concluded that Dr. Downing's treatment of Jonathan did not violate his constitutional rights, we need not consider for purposes of her qualified immunity from suit whether her conduct violated a right clearly established at the time. *See Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). And because the plaintiffs' claims against the County are premised on the same claim that Jonathan received constitutionally inadequate treatment, we need not address the plaintiffs' *Monell* issues. Nor need we address the various causation arguments raised by the County defendants.

**B. Judgment on the Pleadings for the Shorewood Defendants**

 A motion for judgment on the pleadings under Fed.R. Civ.P. 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *Frey*, 91 F.3d at 46. As to the Shorewood defendants, the complaint alleges that Jonathan's father and stepmother informed one of the officers about Jonathan's recent release from jail, his

bizarre behavior, and that he was suicidal. Compl. ¶ 24. It goes on to allege that "[t]hey requested that Jonathan be taken into custody immediately for the purpose of initiating emergency detention procedures." *Id.* The complaint alleges that once the Shorewood police had Jonathan in custody,

> Sgt. Dunn and Officer VanderSchaaf deliberately failed to review any readily available Shorewood Police Department records and incident reports, and County records, concerning Jonathan's extensive recent history of mental illness, involuntary commitment proceedings, his suicide attempt, his release from suicide watch at the Jail that very day, and Shorewood Police Department records from earlier that evening; they also failed to consult with anyone regarding the implementation of emergency detention procedures to continue Jonathan's custody in order to provide him with desperately needed medical treatment and care.

Compl. ¶ 27. The complaint goes on to allege that the officers' inadequacies were a result of their lack of training or Shorewood's policy regarding the implementation of emergency detention hearings. *Id.* The complaint alleges that "[d]espite the desperate pleas of Marc Collignon and his wife that Shorewood retain custody of Jonathan and obtain medical treatment for him, Sgt. Dunn and Officer VanderSchaaf released Jonathan about 1:30 a.m." Compl. ¶ 27. These allegations demonstrate that Marc Collignon and his wife were genuinely concerned, but the allegations also demonstrate that the plaintiffs have no substantive due process claim against the Shorewood defendants.

The complaint seems to allege a right to be taken into custody for the purpose of receiving treatment, but no such right exists. Jonathan had no due process right to be involuntarily committed and thus deprived of his liberty. *Wilson*, 42 F.3d at 1066. It is therefore irrelevant whether the officers declined to initiate involuntary commitment proceedings because, as they allege, they believed Jonathan did not meet the statutory criteria, or, as the complaint alleges, because

---

**2.** Similarly, the expert's opinion that at least some of Dr. Downing's actions were negligent is

irrelevant to the substantive due process issue— the only one before us.

they were inadequately trained, constrained by a bad policy, or simply indifferent to whether Jonathan was involuntarily committed.

Perhaps realizing the futility of arguing that the Shorewood defendants should have taken steps to involuntarily commit Jonathan, on appeal the plaintiffs argue that their allegations assert a claim that the Shorewood defendants exposed Jonathan to a greater risk of suicide. As we noted, state actors may be liable if they place an individual in a position of danger, even if they themselves do not inflict the harm. *E.g.,* *Wallace,* 115 F.3d at 429.[3] The plaintiffs argue that "Shorewood, and its ultimate decision maker, Sgt. Dunn, were required to assess and ameliorate any incremental mental pain and suffering and increased risk of suicide which resulted from Jonathan's seizure and custodial detention by the UWM and Shorewood police departments while he was in a depressed and suicidal state." Appellants' Brief at p. 31. As authority for this sweeping proposition, the plaintiffs cite *Archie,* 847 F.2d at 1223. In that case, we stated: "When the state puts a person in danger, the Due Process Clause requires the state to protect him to the extent of ameliorating the incremental risk." That statement is hardly support for the plaintiffs' broad proposition. The plaintiffs equate temporarily detaining a mentally ill person with "put[ting] a person in danger." There is no comparison, especially under these facts. It is certainly possible that custody, even when quite temporary, is stressful for mentally ill persons like Jonathan. But temporarily detaining someone in Jonathan's situation does not expose him to an "incremental risk" that must then be ameliorated. Before the UMW and Shorewood officers acted, Jonathan was wandering the streets late at night. Having temporarily detained him, the officers returned him to his father and stepmother. In that situation, the risk that he faced was, if anything, reduced. Had the police simply ignored Jonathan, for whatever reason, they would face no liability for their inaction. *See, e.g., Archie,* 847 F.2d at 1223 (no constitutional violation by failing to dispatch ambulance in response to emergency call). The plaintiffs now argue that through intervention that effectively increased his chances of avoiding harm—getting Jonathan off the streets and back to his parents—the police became liable. Not so. Indeed, such an errant rule-in-hindsight would be a strong incentive for the police to avoid any attempt to provide assistance to people like Jonathan and so deny help to others who might benefit from the sort of temporary intervention that the police performed here.

■ Similarly, we must reject the plaintiffs' claim that "Sgt. Dunn's refusal to provide Jonathan with access to medical personnel capable of assessing his known serious medical condition is also actionable." Appellants' Brief at p. 31. For this proposition, the plaintiffs cite *Matzker v. Herr,* 748 F.2d 1142, 1147–48 (7th Cir.1984), overruled in part as recognized by, *e.g., Salazar,* 940 F.2d at 240. Again, the cited authority does not support the plaintiffs' broad assertion. In *Matzker,* a pre-trial detainee had been severely beaten by other detainees in the county jail, suffering a broken nose, an injury to his eye, and three broken teeth. The jail officials transferred him to a hospital where his nose was treated, but his eye and teeth were not. The county held the detainee for three months but refused to provide him any medical treatment for his eye and teeth, resulting in permanent injury, because the jail itself lacked facilities to provide the medical care and the officials refused to transfer him to another institution that had such facilities. Concluding that this set forth a due process claim, we held: "[A] pretrial detainee's due process right to be free from punishment is violated when a jailer fails to promptly and reasonably procure competent medical aid for a pretrial detainee who suffers a serious illness or injury while confined." *Id.* at 1147

---

**3.** Although we have some doubt whether the complaint provided fair notice of this increased-risk claim, *see Kyle v. Morton High School,* 144 F.3d 448, 454 (7th Cir.1998) (*per curiam*) (notice pleading requires " 'short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds

upon which it rests' ") (quoting *Leatherman v. Tarrant County Narcotics and Intelligence Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (emphasis by quoting court omitted)), because the Shorewood defendants respond to the plaintiffs' appellate arguments on the merits, we will do so as well.

(footnote omitted). This rule is, of course, just the well settled principle that when the state restrains an individual's ability to seek necessary aid, it must provide that aid itself. The Shorewood police did not restrain Jonathan's ability to get private aid; indeed they improved his ability to do so by preventing him from wandering the streets in the middle of the night and releasing him to his parents. The plaintiffs are trying to expand the rule that the state must provide medical treatment to pre-trial detainees into a rule imposing an obligation to provide medical treatment whenever the police interact with a person who turns out to have a chronic mental illness, no matter how brief that interaction. When the Shorewood police temporarily took Jonathan into custody, he was clearly not a pre-trial detainee. Also, there is a substantial difference between Jonathan's serious medical need, which was pre-existing and chronic, and the needs of a detainee such as Matzker, which were acute and occurred while in custody. As we said, no treatment would cure Jonathan's chronic mental illness; it could only be treated in the long term and with no guarantee of success. But prompt medical attention would have "cured" Matzker's medical needs—injuries that if treated would heal but if untreated could result in permanent harm—and by confining him, the county prevented him from seeking such aid elsewhere. Here, the Shorewood defendants had no obligation to provide long term care to Jonathan before they temporarily detained him, and did not incur such an obligation by doing so.

The judgment of the district court is AFFIRMED.