In the

# United States Court of Appeals

## For the Seventh Circuit

No. 03-2479

JEFFREY J. SULLIVAN,

*Plaintiff-Appellant,*

*v.*

JON BORNEMANN and ED WHEALON,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00-C-1392—**William C. Griesbach**, *Judge.*

ARGUED JANUARY 14, 2004—DECIDED SEPTEMBER 14, 2004

Before FLAUM, *Chief Judge*, and POSNER and DIANE P.
WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* After Jeffrey Sullivan was
arrested for disorderly conduct, the Shawano County Jail in
Wisconsin refused to admit him without a medical clear-
ance, because of his high breathalyzer test result. To obtain
that clearance, officers Jon Bornemann and Ed Whealon took
Sullivan to the emergency room of a local hospital. After
Sullivan failed voluntarily to produce a urine sample, the
emergency room doctor ordered a catheterization. At the
direction of medical personnel, Bornemann and Whealon
physically restrained Sullivan during the brief procedure.

Believing that the officers' actions violated his constitutional rights, Sullivan brought suit under 42 U.S.C. § 1983 and added a supplemental battery claim under Wisconsin law. Ruling on stipulated facts, the district court concluded that even if Bornemann and Whealon were not authorized to restrain Sullivan, qualified immunity shielded the officers from any liability. We affirm the judgment based on our conclusion that no constitutional violation occurred, which makes it unnecessary for us to reach the second part of the qualified immunity inquiry.

**I**

On November 14, 1999, Bornemann arrested Sullivan and charged him with disorderly conduct. Sullivan was eventually handcuffed after initially resisting arrest. A pat-down search of Sullivan's person turned up a marijuana pipe. Bornemann then transported Sullivan to the Shawano County Jail for processing, where jail personnel administered a breathalyzer test. When Sullivan's test registered a .25, indicating a high level of intoxication, the jail refused to admit him without a medical clearance. Bornemann transported Sullivan to the Shawano Medical Center emergency room.

Upon arrival at the hospital, Sullivan became so uncooperative and verbally abusive that Bornemann called for assistance. Whealon responded to the call, and the two officers accompanied Sullivan into the emergency room. Kathy Actenberg, a certified nurse employed by the Medical Center, took Sullivan's vital signs and noted that he had an elevated heart rate and blood pressure in the upper range of a normal reading. Nurse Actenberg also observed that Sullivan was uncooperative, angry, and combative, and that he seemed disoriented and intoxicated. She knew that Sullivan had a high breathalyzer result and had been found with a marijuana pipe.

After Nurse Actenberg reported these findings to emergency room doctor Rajeshwar Hanmiah, also employed by the Medical Center, Dr. Hanmiah directed her to obtain a urine sample from Sullivan. Dr. Hanmiah testified that he gave this order because Sullivan's behavior was erratic and inconsistent with his level of intoxication and elevated heart rate. Further, Dr. Hanmiah was concerned that Sullivan may have ingested other drugs that would interact with the alcohol in his system. Dr. Hanmiah did not, however, document these concerns on Sullivan's medical chart.

After receiving instructions from Dr. Hanmiah, Nurse Actenberg asked Sullivan to produce a urine sample voluntarily. Sullivan tried but ultimately failed to do so, even after Nurse Actenberg ran water in the bathroom sink to assist him. After half an hour had passed, Dr. Hanmiah directed Nurse Actenberg to obtain a sample by catheterization, a routine non-surgical procedure. Dr. Hanmiah testified that he ordered the procedure based on medical necessity after reviewing Sullivan's physical appearance, disposition, and vital signs.

Nurse Actenberg explained to officers Bornemann and Whealon that Sullivan's ability for movement had to be restricted to minimize the risk of injury and infection during the brief procedure. She did not solicit, nor did the officers offer, any opinions or suggestions about Sullivan's medical care. They played no role in Dr. Hanmiah's decision to order a catheterization. Moreover, Bornemann specifically informed Sullivan that the urine sample would not be used for criminal prosecution or other evidentiary purposes.

After Sullivan was placed on an emergency room bed, Bornemann restrained Sullivan by placing his arms around Sullivan's legs and placing his upper body across Sullivan's legs, using his body weight to hold Sullivan's legs stationary. Whealon applied a pressure point technique consistent

with his law enforcement training to minimize Sullivan's movement. The technique involved Whealon's placing his index finger under the bridge of Sullivan's nose and applying pressure. While Sullivan was restrained by the officers, Nurse Actenberg passed a catheter up Sullivan's urethra to obtain a urine sample. The entire process lasted approximately one minute, with the actual catheterization taking between 4-6 seconds. Subsequent to the procedure, neither Bornemann nor Whealon had any further physical contact with Sullivan. After receiving a medical clearance, Bornemann transported Sullivan back to the Shawano County Jail for processing.

Sullivan never consented to the catheterization and claims that he suffered pain from the procedure and from the pressure point technique applied by Whealon. This prompted him to file the present § 1983 action against the two police officers, Dr. Hanmiah, Nurse Actenberg, and the Shawano Medical Center, alleging violations of his federal constitutional rights. Sullivan alleged a violation of his Fourth Amendment protections against unreasonable search and seizure and a violation of his due process right to refuse unwanted medical treatment. He also asserted a battery claim against officers Bornemann and Whealon and a medical malpractice claim against the hospital defendants.

The district court granted summary judgment in favor of Dr. Hanmiah, Nurse Actenberg, and the Shawano Medical Center on both the § 1983 claims (because the conduct alleged was not done under color of state law) and the medical malpractice claims (because no finder of fact could conclude that the hospital defendants had violated any applicable standards of care). Later, after the case was transferred to a different district judge, the court dismissed the federal and state claims against officers Bornemann and Whealon on qualified immunity grounds.

The district court's analysis first considered the source of authority that permitted Dr. Hanmiah to order the cathe-

terization notwithstanding Sullivan's refusal to consent. It concluded that the physician may not have faced a medical emergency that justified ignoring Sullivan's refusal to consent to the catheterization procedure. Imputing this finding to the police officers, the court concluded that if the doctor's catheterization order was not legally justified, Bornemann and Whealon may not have been authorized to assist by restraining Sullivan.

The court ultimately held, however, that the officers were shielded from liability on the basis of qualified immunity: even if Dr. Hanmiah's medical order was not justified as a matter of law, the defendant officers did not violate any of Sullivan's clearly established rights by restraining him because a rule to the contrary would force police officers to second-guess the medical judgment of emergency room physicians. The district court dismissed the constitutional claims against Bornemann and Whealon on this ground. The district court also dismissed the battery claim, concluding that Wisconsin law immunized the officers from liability because they acted in a discretionary capacity.

Sullivan appeals only from the rulings concerning Bornemann and Whealon, leaving undisturbed the district court's resolution of his federal and state law claims against the hospital defendants.

## II

The district court entered its judgment after receiving a stipulation of the facts from the parties. Although the parties suggest that we should review the judgment as if the court had granted summary judgment, we have explained that the proper standard of review that governs this procedure, more akin to a bench trial than anything else, is found in Federal Rule of Civil Procedure 52(a). *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (internal citations omitted). "As we would after

a bench trial, we will review the district court's legal conclusions *de novo* and review any factual inferences the district court made from the stipulated record as well as its application of the law to the facts for clear error." *Id.*; *Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004).

We review the district court's grant of qualified immunity *de novo*. *Delgado v. Jones*, 282 F.3d 511, 515 (7th Cir. 2002). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court explained the two-step procedure federal courts must use in considering a qualified immunity defense. *Id.* at 200. "[T]he first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered on a more specific level . . . ." *Id.* The threshold question is thus whether the facts alleged here, taken in the light most favorable to Sullivan, show that the officers' conduct violated Sullivan's constitutional rights. *Saucier*, 533 U.S. at 200; *Siegert v. Gilley,* 500 U.S. 226, 232 (1991). We conclude that the answer is no.

Sullivan is not asking us to decide whether the Shawano County Jail's medical clearance process infringed his constitutional rights. Indeed, he conceded at oral argument that such a procedure serves a legitimate state purpose. *Bell v. Wolfish*, 441 U.S. 520 (1979), holds that a particular condition or restriction accompanying pretrial detention is constitutionally permissible if it is reasonably related to a legitimate governmental objective. *Id.* at 539. The defendants assert, rightly in our view, that they have an obvious interest in ensuring that detainees admitted to the jail do not need immediate medical care, as such treatment and care may not be readily available. Without such a procedure, law enforcement officials risk liability if a medical emergency occurs while the detainee is in their custody. See *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1020 (7th Cir. 2003) (explaining that police officers "would have left

themselves open to charges of due process violations for failure to provide appropriate medical care to a pretrial detainee" if they prevented necessary medical treatment); *Collignon v. Milwaukee County*, 163 F.3d 982, 991 (7th Cir. 1998) (stating that the county had a duty to provide for the basic medical needs of a pretrial detainee). We have approved of similar policies calculated to provide reasonable safety to persons in police custody. 163 F.3d at 990 (upholding a jail's enforcement of a suicide watch as "a preventative safety measure" that was prudently designed to eliminate the risk of injury to the detainee). Thus, there is no question that the defendants had a legitimate state interest in taking Sullivan to the emergency room for a medical clearance after he registered a high score on the breathalyzer test.

This case instead poses a far narrower question: did the officers' acquiescence in the nurse's request to help her restrain Sullivan during the brief catheterization procedure violate his rights under either the Fourth or Fourteenth Amendments? The question is narrow for several reasons. Sullivan has not appealed the district court's rulings dismissing the hospital defendants, including the doctor who ordered the catheterization or the nurse who performed it. It is undisputed that Bornemann and Whealon had no input into Sullivan's medical care once he arrived in the emergency room. In addition, Sullivan has not argued that the catheterization was used to search for evidence determining his guilt or innocence. It is uncontested that the catheterization was performed solely to assure Sullivan's medical well-being before he was transported to the county jail. We express no opinion on how, if at all, a difference in any of these circumstances would affect the analysis.

Sullivan's Fourth Amendment claim challenges only his right to be free of an unreasonable search and seizure; he has not argued that Bornemann and Whealon used excessive force in restraining him. Sullivan bases his Fourth Amendment argument on search-and-seizure cases examining

physically invasive procedures used to retrieve evidence from the person of the defendant. *Winston v. Lee*, 470 U.S. 753, 766 (1985) (finding that a compelled surgical procedure to recover a bullet from beneath the skin of a robbery suspect violated the Constitution); *Rochin v. California*, 342 U.S. 165, 172 (1972) (suppressing evidence obtained when the police had the defendant's stomach pumped to retrieve capsules that they could not forcibly extract from his mouth); *Schmerber v. California*, 384 U.S. 757, 771 (1966) (determining that the state could submit drunk drivers to a blood test for purposes of collecting evidence); *United States v. Husband*, 226 F.3d 626, 631-33 (7th Cir. 2000) (considering whether police may use general anesthesia to recover evidence from the person of the defendant); see also *Sparks v. Stutler*, 71 F.3d 259, 261 (7th Cir. 1995) (determining that a catheter could be used for the purpose of evidence retrieval). These cases do not answer the question before us, however, because Sullivan's catheterization was not ordered by law enforcement officers to establish Sullivan's guilt or innocence. The results of the test, which incidently showed the presence of both alcohol and marijuana, were never used in Sullivan's criminal proceedings.

While the Fourth Amendment does protect Sullivan's expectations of privacy, the law provides that this applies only to "legitimate expectations that *in certain places and at certain times* [an individual] has the right to be let alone." *Winston*, 470 U.S. at 758 (citation and internal quotation marks omitted) (emphasis added). It is clear that Sullivan's expectations of privacy diminished substantially once he was arrested for disorderly conduct (an arrest that he has not challenged on probable cause or other grounds), found to have drug paraphernalia on his person, and recorded a high alcohol level on the breathalyzer test. At that point, the officers were entitled to seek medical attention.

There is no rule to the effect that law enforcement officials are constitutionally prohibited from briefly restraining

a detainee at the direction of qualified medical personnel, with the purpose of minimizing injury to the detainee. Under the circumstances here, which we have already recounted, the officers' actions were entirely reasonable. As the district court correctly noted in its discussion of the qualified immunity defense, a holding to the contrary would place law enforcement officers in the impossible position of having to second-guess the medical judgments of emergency room physicians. Police officers like Bornemann and Whealon should not be at risk of liability under § 1983 for medical decisions made exclusively by the emergency room physician. We conclude that the officers' actions under the circumstances presented here did not violate Sullivan's rights under the Fourth Amendment. See *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (noting that the "touchstone of the Fourth Amendment is reasonableness").

Sullivan's due process claim is even less compelling. He relies primarily on *Cruzan v. Missouri Dept. of Health*, 497 U.S. 261, 278 (1990), which held that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment. But *Cruzan,* which dealt with the rights of a person in a persistent vegetative state, has little applicability to these facts. Moreover, the passage in *Cruzan* on which Sullivan relies is followed by an important qualification, in which the Court said that "determining that a person has a liberty interest under the Due Process Clause does not end the inquiry; whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Id.* at 279. We have already noted that the state has a substantial interest in assuring the medical stability of its pretrial detainees; indeed, were it to be deliberately indifferent to their health, it could be sued under the Fourteenth Amendment. *Allen*, 349 F.3d at 1020. Applying the balancing process envisioned by *Cruzan*, we have little trouble finding that the minimal invasion of his privacy interest here is outweighed by the state's interest.

Moreover, Bornemann and Whealon played only a minor role in the alleged invasion of his rights. They had nothing to do with Dr. Hanmiah's decision to order the catheterization. *Allen*, 349 F.3d at 1021 ("Conspicuously absent from the *Cruzan* opinion is any language suggesting that state actors who are not physicians must prevent unwanted medical treatment . . . .") Furthermore, Sullivan strains *Cruzan* by characterizing the county jail's clearance process as the type of medical care for which his consent is required. As his attorney conceded, Sullivan had no right to refuse treatment once he was arrested and transported to the emergency room. Bornemann and Whealon's role in the catheterization procedure did not violate any Fourteenth Amendment norm concerning unwanted medical care. Because their brief restraint of Sullivan did not violate Sullivan's constitutional rights under either the Fourth or Fourteenth Amendments, we need not consider whether the rule for which Sullivan contends was clearly established, or if the officers were entitled to qualified immunity. *Saucier*, 533 U.S. at 201.

## III

Sullivan also brought a battery claim against Bornemann and Whealon under Wisconsin law. A Wisconsin statute provides that no action may be maintained against public agencies or employees for acts done in the exercise of "legislative, quasi-legislative, judicial, or quasi-judicial functions." Wis. Stats. § 893.80(4). Wisconsin courts have recognized these quoted terms as being synonymous with "discretionary functions," *Kimpton v. School Dist.*, 405 N.W.2d 740, 743-74 (Wis. Ct. App. 1987) (citation omitted), and have held that a public officer is immune from suit where the act or acts complained of fall within the scope of the individual's public office. *C.L. v. Olson*, 422 N.W.2d 614, 617-20 (Wis. 1988). The district court dismissed Sullivan's

battery claim because it concluded that Bornemann and Whealon acted in a discretionary capacity when they obtained a medical clearance for Sullivan. Sullivan has raised no argument on appeal to persuade us to reconsider the district court's resolution of this claim.

## IV

For these reasons, we AFFIRM the judgment of the district court.

A true Copy:

      Teste:

                  _____
                  *Clerk of the United States Court of Appeals for the Seventh Circuit*