# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-3919

TIMOTHY SAIN,

*Plaintiff-Appellee,*

*v.*

RAYMOND WOOD,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 6394—**Suzanne B. Conlon,** *Judge.*

———————

ARGUED SEPTEMBER 27, 2007—DECIDED JANUARY 9, 2008

———————

Before BAUER, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Timothy Sain has been civilly committed to the custody of the Illinois Department of Human Services ("IDHS") since 2000. Dr. Raymond Wood, the defendant, is one of several individuals whom Mr. Sain sued under 42 U.S.C. § 1983, claiming that his conditions of confinement violate the Fourteenth Amendment. Dr. Wood moved for summary judgment on the ground of qualified immunity. The district court denied his summary judgment motion, and Dr. Wood appeals the denial of qualified immunity. For the reasons set forth in this opinion, we reverse the judgment of the

district court and remand the case for proceedings consistent with this opinion.

# I

# BACKGROUND

### A.

Timothy Sain, a repeat sex offender, was civilly committed to the custody of the IDHS under the Sexually Violent Persons Commitment Act, 725 ILCS 207/1. From 2000 to 2006, Mr. Sain was held at the Department's Joliet Treatment and Detention Facility. Mr. Sain is HIV positive, and he has a history of sexual interactions with other inmates.

Dr. Raymond Wood was employed by Liberty Healthcare Corporation, a private organization, as the clinical director of the Joliet facility. He was the physician in charge of the treatment program for residents found to be sexually violent under Illinois law. As the clinical director, he did not have responsibility for the physical building or room assignments, although he did serve occasionally on the rooming committee. Issues regarding the room conditions generally were handled by the IDHS Facilities Director, Tim Budz.

The Joliet facility is comprised of two units: a new unit, built in 2001, and an old unit, built in the late 1800s. Mr. Sain was housed in the old unit. The cells in the old unit are small and contain two bunks, a sink, a toilet and a small window. The paint was chipping off the walls of Mr. Sain's room, and the outdated plumbing in the unit

emitted a foul odor.[1] The cells in the old unit also are not air conditioned. Residents cannot control the temperature of their cells in the heat of summer, and Mr. Sain's cell often became very hot. Residents were told to open their windows for ventilation, but some windows, including Mr. Sain's, did not have screens. Opening the window allowed bees, wasps and spiders to come into his cell.

Even during the winter, Mr. Sain's cell was infested with roaches. He claims that he saw roaches crawling around his cell, coming from under his bed and out of cracks in the wall and sink. He also states that he was bitten several times and was treated for bites by the facility physician.[2] An exterminator visited the Joliet facility on a regular basis, however, and he frequently sprayed Mr. Sain's room.

Mr. Sain alleges that he repeatedly requested to be moved to the air conditioned new unit. Each time his request was considered, however, it was denied by the facility's rooming committee. A variety of reasons were given for the denials, including Mr. Sain's HIV-positive status, his history of sexual interactions with other residents and his failure to participate in sex-offender treatment. Dr. Wood, as clinical director, was a member of the rooming committee and attended placement meetings on

---

[1] In both the old and new units, water was supplied by a Joliet facility well. The water smelled foul and was brown in color. Mr. Sain's complaint alleged health violations involving the water; Dr. Wood was not included in that count, however, and Mr. Sain maintains that he is not suing Dr. Wood based upon his problems with the drinking water.

[2] His physician testified that he in fact had treated Mr. Sain, but he could not recall finding any evidence of a bite.

occasion; it is unknown, however, whether he was present at the meetings in which Mr. Sain's requests were discussed.

Mr. Sain claims that he wrote a letter to Dr. Wood regarding the conditions in his cell, including the roaches, flies, bees, wasps, spiders, water odor and falling paint chips. Additionally, Mr. Sain alleges that he had a face-to-face discussion with Dr. Wood about his desire to move, although he admitted that he did not tell Dr. Wood that the reason he wanted to move to the new unit was related to the conditions of his room. He also did not mention bugs or water quality in this conversation. Mr. Sain also sent a number of official requests to speak with Dr. Wood, but they were each denied, and his complaints presumably were forwarded to his primary caseworker according to facility policy.

No letter to Dr. Wood from Mr. Sain ever was produced, and Dr. Wood denies ever seeing any such letter. He also does not recall discussing Mr. Sain's requests at any of the few rooming committee meetings that he attended. Dr. Wood claims that he does not remember any conversations with or letters from Mr. Sain, and that he was not aware of the problems with Mr. Sain's living conditions. Such complaints generally were handled by a patient's primary caseworker.

**B.**

Mr. Sain sued Dr. Wood and a number of other Joliet officials for violations of his Fourteenth Amendment due process rights. Dr. Wood moved for summary judgment, contending that Mr. Sain had not produced any evidence showing that Dr. Wood had known of Mr. Sain's

conditions of confinement or that Dr. Wood had been deliberately indifferent to his plight. Additionally, Dr. Wood contended that he was entitled to qualified immunity.

The district court concluded that the evidence presented, viewed in the light most favorable to Mr. Sain, could support a reasonable inference that: (1) Dr. Wood knew of Mr. Sain's conditions of confinement, (2) Dr. Wood could have addressed his complaints by moving him to the new facility, and (3) his decision not to do so exhibited deliberate indifference. Therefore, a genuine issue of material fact existed for trial.

The district court also denied Dr. Wood's invocation of qualified immunity. It stated:

> The Supreme Court articulated a well-established constitutional right to humane conditions of confinement . . . . Woods [sic] was clinical director of the Joliet facility. He supervised the associate clinical director and indirectly supervised the clinical staff. As the individual with the highest level of clinical responsibility, a reasonable person in Woods' [sic] position would have known Sain's purported living conditions were a constitutional deprivation. Wood is not entitled to qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

*Sain v. Budz*, 2006 WL 2796467 at *7 (N.D. Ill. 2006) (internal citations omitted). Accordingly, the court denied Dr. Wood's request for summary judgment. Dr. Wood now appeals the district court's refusal to grant him qualified immunity.

## II

## DISCUSSION

### A.

Generally, this court lacks jurisdiction under 28 U.S.C. § 1291 to review a district court's denial of summary judgment. An exception to the final judgment rule exists, however, for defendants requesting summary judgment based on qualified immunity. *Via v. LaGrand*, 469 F.3d 618, 622 (7th Cir. 2006). Under the "collateral order doctrine," a denial of qualified immunity "is an immediately appealable 'final decision' . . . to the extent that it turns on legal rather than factual questions." *Id*.

Inviting our attention to *Johnson v. Jones*, 515 U.S. 304 (1995), Mr. Sain contends that we lack jurisdiction over Dr. Wood's qualified immunity appeal because it involves a mixed question of fact and law rather than an "abstract question of law." *See id.* at 317. *Johnson* held that a party "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pre-trial record sets forth a genuine issue of fact for trial." 515 U.S. at 319-20. Dr. Wood allocates a significant number of pages in his brief to parsing the facts regarding his knowledge of the allegedly inhumane conditions; this approach, Mr. Sain contends, illustrates that Dr. Wood is asking us to resolve genuine issues of material fact contrary to the Supreme Court's holding in *Johnson*.

Mr. Sain's reading of *Johnson* has been rejected on numerous occasions, by both the Supreme Court and this court. *See, e.g., Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996); *McKinney v. Duplain,* 463 F.3d 679, 686-91 (7th Cir. 2006); *Via*, 469 F.3d at 623. It is well settled that *Johnson* did

not prohibit appellate review of a district court's applica-tion of law to facts—it merely prohibited an appellate court from parsing the record to determine whether the proffered evidence was sufficient to prove a material fact. *Behrens*, 516 U.S. at 312-13 ("Denial of summary judg-ment often includes a determination that there are con-troverted issues of material fact . . . , and *Johnson* surely does not mean that *every* such denial of summary judg-ment is nonappealable."). *Johnson* addresses only those cases in which the issue on appeal is "nothing more than whether the evidence could support a finding that par-ticular conduct occurred." *Id. Johnson* does not preclude appellate review of a district court's *legal* application, even if the court's decision necessarily involves mixed questions of fact and law. *See, e.g., Sallenger v. Oakes*, 473 F.3d 731, 738-39 (7th Cir. 2007) (engaging in a "totality of the circumstances" inquiry into the reasonableness of a seizure); *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003) (accepting jurisdiction because "probable cause [and by analogy, reasonable suspicion] is normally a mixed question of law and fact, but where, as here, one side concedes the other's facts as to what happened, it is a question of law").

For the purpose of this appeal, Dr. Wood can assume Mr. Sain's version of the facts—specifically, that Dr. Wood had actual knowledge of Mr. Sain's living condi-tions and the ability to address them—but he may still maintain that his subsequent refusal to order relocation in those circumstances did not amount to legally action-able deliberate indifference. *McKinney*, 463 F.3d at 688 ("[T]he real question was whether, taking the facts as assumed by the district court, [defendant's] actions vio-lated the Constitution."). Whether Dr. Wood knew of

Mr. Sain's living conditions is a disputed question of fact, but for the purpose of this inquiry, we shall accept the plaintiff's assertions of actual knowledge. Whether Dr. Wood's actions based on that knowledge amounted to deliberate indifference is a mixed question of fact and law properly resolved by this court. Therefore, we have jurisdiction over this appeal.

**B.**

For the first time on appeal, Mr. Sain contends that Dr. Wood is not a state actor, and therefore he is not entitled to invoke qualified immunity. He relies on *Richardson v. McKnight*, 521 U.S. 399, 412 (1997), which held that privately employed prison guards could not receive qualified immunity because they were not public officials for the purposes of the qualified immunity doctrine. Similarly, Mr. Sain submits, because Dr. Wood is employed by Liberty Healthcare, a private firm managing the Joliet detention facility, he is not entitled to invoke qualified immunity.

*Richardson* involved private prison guards employed by a large firm specializing in providing security for correctional facilities. The guards, although they were not directly employed by the government, contended that they should enjoy qualified immunity because they performed the same functions as state prison guards, who did receive immunity. The Court rejected this "functional approach." *Id*. at 408-09. Instead, it looked at the two purposes underlying government employee immunity to determine whether immunity should be extended to private employees performing public or quasi-public functions. These factors were: (1) a "firmly rooted"

tradition of immunity, and (2) the "special policy concerns involved in suing governmental officials," 521 U.S. at 404, namely "protecting the public from unwarranted timidity on the part of public officials" and ensuring that "talented candidates were not deterred by the threat of damages suits from entering public service," *id*. at 408.

The Court in *Richardson* concluded that no firmly rooted tradition of immunity existed for a private prison guard, an occupation that had been in existence in a private capacity (and without immunity) throughout most of our Nation's history. *Id*. at 407. Additionally, it found that the special policy considerations justifying government employee immunity were not present in that case: The threat of competition from other organized private corrections firms would prevent unwarranted timidity from the guards, and readily available insurance and private compensation packages ensured that talented employees would not be deterred by this type of service. *Id*. at 409-13.

The Court specifically noted, however, that its determination in *Richardson* was limited to the facts of that case, in which "a private firm, systematically organized to assume a major lengthy administrative task . . . with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms." *Id.* at 413. It further clarified: "The case does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision." *Id*.

Prior to 1997, we twice granted qualified immunity to privately employed prison psychologists because they were performing a government function. *Williams v.*

*O'Leary*, 55 F.3d 320, 324 (7th Cir. 1995); *Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 405-06 (7th Cir. 1993). However, we have no comparable post-*Richardson* cases, and *Richardson* specifically rejected the "public function" analysis. 521 U.S. at 408-09. The law in this circuit is therefore far from conclusive on this question.

Other circuits have encountered cases involving similar circumstances, however, and have determined that certain private medical personnel working in public facilities are not entitled to qualified immunity under *Richardson*. In *Jensen v. Lane County*, 222 F.3d 570, 576-79 (9th Cir. 2000), the Ninth Circuit held that a contract psychiatrist in a county facility was not entitled to immunity because: (1) there was no firmly rooted tradition of immunity for psychiatrists, (2) private market forces operate to ensure psychiatrists adequately perform their duties, or fear replacement, (3) the psychiatrist's role in that case was a complex administrative task rather than a discrete public service task, and (4) the threat of distraction by lawsuits was insufficient because private psychiatrists often deal with such lawsuits. *Id*. at 577-79. In *Hinson v. Edmond*, 192 F.3d 1342 (11th Cir. 1999), the Eleventh Circuit, following the same *Richardson* analysis, held that the privately contracted medical director of a county jail was not entitled to qualified immunity. *Id*. at 1346-47. The court emphasized that the physician had a good degree of autonomy in his medical treatment and policies, external market forces would ensure adequate treatment, and private salaries and insurance would prevent deterrence of qualified candidates. There are two First Circuit cases reaching an opposite conclusion; however, both failed to cite *Richardson*, and their analysis of the issue was cursory. *See Burke v. Town of Walpole*,

405 F.3d 66, 88 (1st Cir. 2005); *Camilo-Robles v. Hoyos*, 151 F.3d 1, 10 (1st Cir. 1998).

It is extremely difficult to apply the *Richardson* standard to the facts of this case. This difficulty stems not only from the lack of Seventh Circuit guidance on the issue, but also from the lack of relevant factual development in the record. The history of sex offender detention programs in Illinois, the extent of Liberty's control over the facility, the details of its interaction with the state, and the robustness of market competition in Liberty's field are not readily ascertainable, either from the district court's opinion or from the record. Dr. Wood attempts to address these issues in his reply brief, claiming that he had limited autonomy under the relevant statute, that he served as an adjunct to IDHS, and that no competitive market exists for his specific type of "sexually violent persons" specialty. The sparse record, however, neither supports nor negates these assertions.

This dearth of information in the record stems directly from Mr. Sain's failure to contest Dr. Wood's assertion of qualified immunity before the district court. In fact, despite numerous opportunities to do so, there was never a mention of Dr. Wood's status as a private contractor until Mr. Sain's brief on appeal. The parties and the district court apparently assumed that Dr. Wood was an appropriate party to assert qualified immunity; the briefs to the district court, as well as the district court's decision, discussed only whether Dr. Wood had disqualified himself from immunity by violating a clearly established constitutional right. Because the issue of Dr. Wood's status as a private employee was never raised at the district level, the record is silent on the facts necessary to determine whether he nevertheless may invoke qualified immunity under *Richardson*.

Mr. Sain's failure to raise at the district court level the issue of Dr. Wood's ineligibility for qualified immunity because of his private employment resulted in a forfeiture of the argument, which we review only for plain error. *See, e.g., United States v. Thigpen*, 456 F.3d 766, 769 (7th Cir. 2006). Given the absence of any record addressing *Richardson*'s multi-factored test, the district court did not commit plain error in assuming (albeit implicitly) that Dr. Wood was entitled to assert qualified immunity. We therefore decline to address the merits of this argument and assume, for the purpose of this case only, that Dr. Wood is entitled to assert qualified immunity. *See Perez v. Oakland County*, 466 F.3d 416 (6th Cir. 2006) (adopting a similar approach).

## C.

Governmental and quasi-governmental actors performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court articulated a two-part test for determining whether an actor is entitled to qualified immunity: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" (2) "If a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* at 201. We review de novo a district

court's denial of summary judgment on qualified immunity grounds. *Sallenger*, 473 F.3d at 739.

As a civilly committed detainee, Mr. Sain is protected by the Due Process Clause of the Fourteenth Amendment. *Collignon v. Milwaukee County*, 163 F.3d 982, 987 (7th Cir. 1998). His protection against cruel and inhumane treatment has been defined as at least as extensive as that afforded to prisoners by the Eighth Amendment. *Id.*; *see also Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005) (applying Eighth Amendment analysis to a section 1983 claim brought by a Joliet facility resident awaiting a civil commitment trial). The Eighth (and Fourteenth) Amendment requires that Mr. Sain be housed under "humane conditions" and provided with "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To show a constitutional violation and defeat Dr. Wood's invocation of qualified immunity, Mr. Sain must prove *both* (1) that he suffered a sufficiently serious deprivation and (2) that Dr. Wood acted with "deliberate indifference" to his conditions of confinement. *Id*. at 837.

Mr. Sain contends that his conditions of confinement amounted to a sufficiently serious deprivation. Specifically, he submits that the peeling paint, foul odor and lack of air-conditioning in his cell, his inability to open his window without letting in bugs, and a cockroach infestation in the unit amounted to inhumane treatment in violation of the Fourteenth Amendment.

Mr. Sain relies upon *Board v. Farnham*, 394 F.3d 469 (7th Cir. 2005), for his assertion that poor ventilation may amount to a constitutional deprivation. However, this case involved toxic mold in air ducts and evidence of severe nosebleeds and respiratory problems, conditions

far more serious than those alleged by Mr. Sain. Similarly, his suggestion that the lack of air-conditioning is a serious deprivation relies on a case involving substantially different circumstances—there, a failure to provide working heat for an extended period of time in extremely cold temperatures. *See Henderson v. DeRobertis*, 940 F.2d 1055 (7th Cir. 1991). The peeling paint or an unpleasant odor in a cell described in this record, along with the absence of any evidence of serious injury, does not amount to constitutional deprivation.

Mr. Sain also contends that the cockroaches in his cell were so unsanitary that they established inhumane living conditions. We have held that a prolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation sufficient to constitute a due process violation. *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996). In *Antonelli*, however, we emphasized that "the allegation of sixteen months of infestation and significant physical harm" distinguished his case from the typical pest-infestation complaint. *Id*. Here, Mr. Sain alleges that, during his approximately six-year confinement in the old unit, he often saw "several" cockroaches crawling in his cell. R.113 at 5. He also alleges that he was bitten by a cockroach twice during his time in detention. *Id*. He concedes, however, that an exterminator regularly visited his cell—every month or month and a half—and also would come in response to Mr. Sain's complaints. *Id*.

The conditions of Mr. Sain's detention were certainly unpleasant. The state deserves no praise for permitting them to persist. However, we cannot say that, whether considered individually or collectively, they constitute a constitutional violation. To be considered a constitutional violation, Mr. Sain's deprivations must be "objectively

serious." We conclude that a reasonable jury could not conclude that Mr. Sain's conditions of confinement were objectively serious enough to establish a constitutional violation.

Even if Mr. Sain were able to show that his conditions of confinement were sufficiently serious to establish a constitutional deprivation, he must also show that Dr. Wood's failure to transfer him into the new unit was a result of "deliberate indifference." The test for deliberate indifference is a subjective one: The official must "both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

In the context of medical professionals, this standard also has been described as the "professional judgment" standard: A medical professional is entitled to deference in treatment decisions unless "no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Collignon*, 163 F.3d at 988 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982)); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

The district court concluded that Mr. Sain's evidence that Dr. Wood had knowledge of Mr. Sain's conditions of confinement, and that he had the ability to correct the deprivations, was sufficient to survive summary judgment.

Even assuming that Dr. Wood knew of the conditions of confinement and had the authority to remedy them, the record does not support the conclusion that he acted with deliberate indifference.

Mr. Sain focuses on Dr. Wood's failure to transfer him to the new unit, which was more sanitary and comfortable than the old unit. The record reflects, however, that Dr. Wood, in his professional judgment, decided that transferring Mr. Sain to the new unit would contravene his treatment objectives. Therefore, he chose to address Mr. Sain's pest-infestation complaints by regularly exterminating his cell.

The record is undisputed that the rooms in the old unit were regularly (in the plaintiff's words, "frequently") exterminated. R.113 at 5. Although we have held that an occasional extermination (twice in sixteen months) does not, by itself, negate a showing of deliberate indifference, *Antonelli*, 81 F.3d at 1431, the policy of "frequent" exterminations in this case, made monthly and in response to plaintiff's requests, certainly cannot support a claim of deliberate indifference here.

Additionally, substantial and uncontroverted evidence in the record shows that Mr. Sain's requests to transfer to the new unit were denied on the basis of permissible, professional justifications. Dr. Wood testified that patients' requests to transfer to the new unit often were denied because of a facility policy that kept those detainees who refused to participate in sex-offender treatment in the old unit. Transfers to the new unit were used as a re-

ward—an incentive to participate in treatment programs.[3] Mr. Sain admits that this policy was the explanation given to him after each of his requests for removal, and that he nevertheless refused to participate in treatment.

Moreover, Mr. Sain was HIV positive and had been sexually aggressive. Most rooms in the new unit were double-occupancy rooms. It is certainly within the bounds of reasonable professional judgment to avoid transferring an HIV-positive patient with a history of impermissible sexual behavior with other inmates to a room with another detainee. Mr. Sain offers no evidence to show that this justification was a sham or otherwise impermissible.

In sum, even assuming that Dr. Wood knew of Mr. Sain's complaints about the heat, bugs, paint chips and foul odor, undisputed evidence in the record shows that Dr. Wood's refusal to transfer Mr. Sain was not indicative of "deliberate indifference." Instead, the decision to house Mr. Sain in the old unit (to the extent that Dr. Wood was involved in this decision) was based on a professional judgment as clinical director of the Joliet facility that we cannot say amounted to deliberate indifference. Therefore, even if his living conditions were sufficiently serious to constitute a constitutional violation, Dr. Wood was not deliberately indifferent and therefore cannot be

---

[3] *See, e.g., Bd. v. Farnham*, 394 F.3d 469, 477 (7th Cir. 2005) ("[C]onditions of confinement which are reasonably related to a legitimate and non-punitive government goal are not unconstitutional, and we caution that this court will give a high degree of deference to the discretion of prison administration to adopt policies and practices to maintain the safety and security of this country's penitentiaries.") (internal quotations omitted).

held to have violated Mr. Sain's clearly-established constitutional rights.

### Conclusion

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*