In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1786

STEVEN KALLAL,

*Plaintiff-Appellant,*

*v.*

CIBA VISION CORPORATION, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 3346 — **Rebecca R. Pallmeyer**, *Judge.*

ARGUED OCTOBER 1, 2014 — DECIDED FEBRUARY 24, 2015

Before WOOD, *Chief Judge*, and RIPPLE and TINDER, *Circuit Judges*.

WOOD, *Chief Judge*. More than 30 million people in the United States wear contact lenses, according to the Centers for Disease Control and Prevention. See http://www.cdc. gov/contactlenses/fast-facts.html (last visited Feb. 24, 2015). People like them for a number of reasons: vanity, effectiveness of vision correction, convenience, to name a few. But contacts come at a price. Serious eye infections that can lead

to blindness affect up to 1 out of every 500 contact lens users per year, *id.*, and lesser complications are common. Steven Kallal experienced the latter kind of problem during the five months when he wore lenses made by CIBA Vision Corporation.

Nearly two years after he abandoned his CIBA lenses, Kallal sued the company in Illinois state court; he alleged that CIBA's lenses were defective, and that the defect had hurt his eyes. Indeed, CIBA itself had spotted a problem with some of its lenses and had issued a major recall. CIBA removed Kallal's case to federal court and eventually moved for summary judgment on the ground that Kallal never used the recalled lenses. Noting that Kallal's proof of defect relied entirely on the recall, and that the evidence showed that Kallal himself never purchased any of the recalled lenses, the district court granted judgment for CIBA. We affirm.

# I

Kallal began his use of CIBA's O2 Optix lenses in December 2006 when he received a sample pack from Rose Optical, in Godfrey, Illinois. He then purchased more O2 lenses from Rose Optical and began wearing them in January 2007. A week after he started using the purchased lenses, Kallal experienced sharp pain in his eyes. He did not, however, immediately discontinue use of the lenses, perhaps because he had had eye problems with other contacts before then. Instead, he limited his use of the contacts to times when he exercised. He continued to wear the O2 lenses off and on for a few months, and even purchased another set in March 2007. Kallal stopped wearing the lenses altogether after May 5, 2007.

In the meantime, CIBA had discovered that a large number of the contact lenses it manufactured had poor ion permeability and thus did not permit enough oxygen to reach the cornea. On January 12, 2007, the company recalled 11 million contact lenses for this reason. The recalled lots included some O2 Optix lenses ordered by Rose Optical.

On May 1, 2009, Kallal sued CIBA in the Circuit Court of Cook County. Alleging that the O2 lenses caused his pain, Kallal asserted that CIBA was liable for negligence, strict product liability, and breach of implied warranty. CIBA timely removed the case to federal court on June 3, 2009, relying primarily on the court's diversity jurisdiction. See 28 U.S.C. § 1332. (Kallal is a citizen of Illinois; at the time suit was filed, CIBA was incorporated in Delaware and had its principal place of business in Georgia, and Kallal alleged that more than $75,000 was at stake.) After more than two years of motion practice, some discovery, and other delays, CIBA moved for summary judgment on the ground that Kallal never used the recalled lenses. It relied on evidence showing that none of lenses shipped to and later recalled from Rose Optical were in Kallal's prescription strength of -3.75 diopters. On January 29, 2013, the district court granted the motion for summary judgment on all counts.

## II

Kallal offers three reasons why, in his view, we should overturn the district court's decision: first, he contends that the district court overlooked genuine issues of material fact; second, he urges that the district court abused its discretion by denying his request for additional discovery under Rule 56(d); and finally, he complains that the court should not have relied on preemption as an independent basis for deci-

sion after preventing him from developing that theory through discovery. Our review is *de novo*, see *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014), and we bear in mind that we may affirm "on any ground for which there is support in the record." *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008).

## A

Before ruling on CIBA's summary judgment motion, the district court had pared Kallal's case down somewhat in a ruling of June 9, 2010, on CIBA's motion to dismiss. Kallal has not challenged that ruling. This means that he has only one legal theory left for why CIBA would be liable for his eye pain: that he used lenses that were subject to CIBA's 2007 recall. As we already have noted, however, during discovery, CIBA showed that none of the lenses shipped to Rose Optical that fell within the terms of the recall matched Kallal's prescription. Kallal admits that he bought lenses only from Rose Optical. It is therefore hard to see what is left to argue about. Somehow, Kallal must show that his O2 lenses were included in the recall, despite the documentation to the contrary. He believes that he can meet this burden with circumstantial evidence.

Kallal's strongest argument is that CIBA's voluntary recall was so huge that the company could not possibly have known which lenses were defective. More than that, Kallal points out that some of the lenses he wore were manufactured in Batam, Indonesia, in the plant that had also manufactured the recalled lenses. From that, he draws the inference that every lens made in Batam must have been similarly flawed. The problem is that the record does not support that final leap. CIBA demonstrated, to the contrary, that the

lenses from the Batam plant in Kallal's prescription strength were not part of a recalled lot.

The district judge dismissed Kallal's evidence as a mere "wisp of circumstantial evidence." We agree with her that it is too thin on its own to carry the day. Kallal has not demonstrated what defect his O2 lenses had. Instead, he presents an argument that sounds like *res ipsa loquitur*: a substantial percentage of lenses from the Batam plant were defective; Kallal wore lenses made at that plant; *ergo*, Kallal's lenses were defective. To defeat summary judgment, however, he needed more. Much more, in fact. Kallal admitted to having reacted poorly to other companies' contact lenses. No design defect theory would establish CIBA's liability if Kallal is simply allergic to all contacts. But Kallal never pointed to evidence supporting a finding that not all of his contact use has led to discomfort and pain. Instead, he asked the court to "question the reliability" of CIBA employees and to be "suspicious of records showing that no recalled lenses in Kallal's prescription were shipped to Rose Optical." This is too vague to be useful.

Kallal's remaining arguments are also weak. He argues, for instance, that a physician's deposition and an expert witness's affidavit both created disputes of material fact about his injury. But they do not. The physician, Dr. Pathak, did no more than state at his deposition, in response to a hypothetical question based on a causal assumption about the link between two characteristics of contact lenses, that Kallal's injuries could have been caused by defective lenses. He did not offer an opinion on the question whether the lenses that Kallal wore actually caused his injuries. Len Czuba, an engineer Kallal put forth as a medical device expert, testified that

low ion permeability *could* cause injuries similar to Kallal's. That testimony, however, sheds no light on the question whether Kallal's lenses were defective. We accept that Kallal exhibited symptoms after wearing CIBA's O2 Optix lenses, but the record needs to show more than *post hoc, ergo propter hoc*:  the mere fact that a person suffers pain when using a product does not, by itself, prove that the product is defective. Kallal offered no factual support that would permit a reasonable trier of fact to conclude his injuries stemmed from defective CIBA lenses and not from a general reaction to all contact lenses or something else altogether.

To recap, Rose Optical—Kallal's sole supplier of contact lenses during the relevant period—never received CIBA lenses in Kallal's prescription that were within the scope of the recall. Looking exclusively at the evidence before the court on the defective product theory, we conclude that CIBA was entitled to summary judgment.

B

Kallal next argues that the record was incomplete, because the district judge abused her discretion when she denied his request for more discovery. Kallal had hoped to depose CIBA's new interim head of distribution in order to ask him about the business records on which CIBA was relying to prove that Kallal did not use any of the recalled lenses. Kallal failed, however, to file a Rule 56(d) affidavit explaining why he needed additional discovery. His failure to do so fully justified the district court's ruling. See *Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir. 2000) (concluding that, at summary judgment, the nonmovant's failure to submit an accompanying affidavit "alone justifies affirmance of the district court's decision" to deny additional discovery).

Kallal's only response to this well-established rule is an argument that the 2010 Amendments to the Federal Rules of Civil Procedure have eliminated the requirement of a formal affidavit for a motion under Rule 56(d). Nothing in Rule 56(d) or the commentary to that subsection, however, says any such thing. Kallal notes that Rule 56(c), which sets out the procedure for describing the facts, no longer requires a formal affidavit. See FED. R. CIV. P. 56 (Cmte. Note to 2010 Amdt.). Immediately after that statement, the commentary confirms that, as 28 U.S.C. § 1746 permits, "a written un-sworn declaration, certificate, verification, or statement sub-scribed in proper form as true under penalty of perjury" may "substitute for an affidavit." *Id.* Even if this part of Rule 56(c) governs a motion under Rule 56(d), Kallal failed to sat-isfy it.

A supporting document would in any event not have guaranteed more discovery. "The decision to cut off discov-ery is committed to the management skills of the district court." *Stevo v. Frasor*, 662 F.3d 880, 886 (7th Cir. 2011) (quo-tation omitted). The district judge did not abuse her discre-tion when she decided that Kallal did not need to depose CIBA's new interim head of distribution. Kallal already had deposed the old one, Kent Goethe. He asked Mr. Goethe about the business records confirming that no -3.75 lenses were recalled from Rose Optical. The district judge was well within the bounds of reason when she decided that Mr. Goe-the's deposition would suffice.

Kallal also complains about the district court's decisions to suspend discovery until October 2011 and then to set a six-month time limit on discovery, "despite the fact that this was a complex product liability case." Perhaps he means to

say that the court took an iron-fisted approach. But the record reflects a different reality: the district judge gave Kallal multiple opportunities and extensions in his filings and discovery requests. Although the court denied his last request for more discovery, that denial came at the end of a long line of requests the court had granted. Nothing in the court's rulings on this aspect of the case amounts to reversible error.

C

Finally, Kallal claims the district judge erred when she mentioned in her opinion granting summary judgment that Kallal's claims were most likely preempted by the Medical Device Amendments (MDA) to the Food, Drug, and Cosmetic Act. CIBA's O2 contact lenses are Class III devices within the meaning of that statute. Under the MDA, federal law preempts state law tort claims with respect to Class III medical devices. Covered devices must be approved by the Food and Drug Administration (FDA) pursuant to the agency's pre-market approval process. Preemption is not absolute, however; the Supreme Court has interpreted the statute to allow any state tort claim that is "parallel" to a federal one (*i.e.*, if it is a "remedy for claims premised on a violation of FDA regulations"). *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330 (2008). Kallal says that his suit fits under the *Riegel* exception because CIBA failed to list ion permeability as a "material characteristic" in its premarket approval list. CIBA responds that the FDA did not require it to meet any ion permeability threshold, and Kallal did not offer any evidence to the contrary.

We do not need to resolve this issue, for the simple reason that the district court did not rely on preemption as a ground for its decision. Its opinion leaves no doubt that the

ruling was based on the facts we already have discussed: Kallal never used the recalled lenses nor did he provide any other evidence that the lenses he used were defective. The preemption analysis is classic dicta, because it "can be sloughed off without damaging the analytical structure of the opinion." *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988). We thus have nothing further to say about it.

### III

Once CIBA demonstrated that the lenses that it manufactured and Kallal used were not subject to the 2007 recall, the company was entitled to summary judgment. The district judge reasonably managed the discovery process and did not abuse her discretion in denying Kallal's noncompliant Rule 56(d) motion. Because the court did not rely on preemption as a ground for decision, anything it said on that topic can be disregarded as dicta. The judgment of the district court is AFFIRMED.