NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted July 5, 2017[*]
Decided July 6, 2017

**Before**

RICHARD A. POSNER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

Nos. 16-3716, 16-3717 & 16-3731

| | |
|---|---|
| DOTHAN ROGERS, JIMMIE PAIGE, and JOHN SWANSON, *Plaintiffs-Appellants,* | Appeals from the United States District Court for the Central District of Illinois. |
| *v.* | No. 13-CV-3240 |
| GREGG SCOTT, et al., *Defendants-Appellees.* | Sue E. Myerscough, *Judge.* |

**O R D E R**

For 23 days in the middle of summer, the air conditioning in one of the units of the Rushville Treatment and Detention Facility stopped working. Two weeks into the outage, more than 30 residents filed lawsuits under 42 U.S.C. § 1983 claiming that Rushville's director and employees were deliberately indifferent to the discomfort and health risks resulting from the extreme heat. The district judge consolidated the cases

---

[*] We have agreed to decide these cases without oral argument because the briefs and record adequately present the facts and legal arguments. *See* FED. R. APP. P. 34(a)(2)(C).

and after discovery granted summary judgment for the defendants. Only three of the plaintiffs in the consolidated cases—Dothan Rogers, Jimmie Paige, and John Swanson—have appealed. Because a jury could not find that the defendants deliberately disregarded the ill effects from the lack of air conditioning, we affirm.

We review a grant of summary judgment de novo, construing the record in the light most favorable to the opponents. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016). Three compressors provide cooling in the plaintiffs' unit, which has windows that cannot be opened. One of those compressors failed in early July 2013, and on July 24 before that first compressor could be repaired, a second one also failed. The remaining compressor was inadequate by itself to cool the plaintiffs' unit (though air still could be circulated through the vents). There is some disagreement about the measures the defendants took to relieve the resulting heat, but there is no genuine dispute about the following facts.[1] For eight days after the second compressor failed, the internal temperature, as measured and logged electronically, stayed in the middle 70s. Then on August 2 the inside temperature reached 80 degrees. Rushville's engineer had been trying to repair the system, but on August 5 he abandoned this effort and notified Rushville's director that two compressors costing $10,000 each were needed to make the system operational. That same day the Department of Human Services, which operates Rushville, approved the expense. Two days after that, Rushville administrators submitted the necessary paperwork to a state procurement officer, explaining that the purchase should be made "as quickly as possible" because residents were beginning to complain. The electronic logs show that the internal temperature peaked at 85 degrees on August 7 and remained in the low 80s until repairs were completed nine days later.

---

[1] At summary judgment the plaintiffs contested a declaration from Rushville's director, *see* 28 U.S.C. § 1746, offered on behalf of all the defendants, explaining the operation of the unit's air-conditioning system. The plaintiffs objected that Rushville's director lacks expertise with air-conditioning systems and that "no expert testimony or blue prints" had been introduced. But the director's declaration is corroborated by the declaration of the facility engineer, who *is* an expert on Rushville's air-conditioning system. The plaintiffs also contested the director's averment that when the second compressor failed on July 24, the staff already had been working on the first compressor and continued trying to repair the system. Again the engineer confirmed the director's statement, and the engineer would know because he was doing the work. Regardless, the plaintiffs' concerns do not amount to genuine disputes because they did not introduce any evidence to contradict the defendants' evidence. *See Carroll v. Lynch*, 698 F.3d 561 (7th Cir. 2012).

On August 8 the district court received the first of the § 1983 complaints. That same day the shift commander in the plaintiffs' unit directed staff to open the outside door at night (when Rushville's residents are secured in their rooms), allow residents to freely open their "chuckholes" (4" by 12" slots in the solid room doors for delivering meals), and place fans in the outside entrance to facilitate airflow. Rushville's director also asked staff to ensure that residents had adequate access to ice. The following day more residents filed lawsuits, prompting the district court to contact the state Attorney General's office about the situation. That same day the procurement officer finalized the order for compressors, and installation was set for August 16.

Throughout the outage the residents had access to water in their rooms and except at night, showers in the dayroom. But the tap water was "hot," they contended, and the showers worsened the internal humidity. The residents' doors open to the shared dayroom, where staff had placed industrial-sized fans, but those fans had minimal effect day or night. The relief from opening the outside door at night also was minimal since by that hour the residents were locked in their rooms.

The areas of disagreement between the parties largely concerned how much of the defendants' efforts to minimize the heat filtered down to individual residents. Residents don't automatically receive personal fans but can purchase them from outside vendors. The defendants expedited this process during the outage, though the residents say this step was not taken until after the first lawsuit was filed on August 8, too late to benefit anyone. But there is no dispute that the only two residents who filed grievances asking to borrow a fan were loaned one at no cost. The defendants also provided extra ice for the residents, although the supply was limited by the capacity of the three ice machines and some residents did not benefit. Rushville administrators further authorized residents to have unfettered access to a side yard during the day (beyond their normal yard access and rotating use of an air-conditioned gym shared with other housing units), but several residents complained they did not receive this privilege. Medical care was not interrupted by the outage, and only one of the named plaintiffs (who is not a party to this appeal) submitted a medical request related to the heat.

By the time the air conditioning was repaired, 35 residents had filed suit. The district court ordered each plaintiff to submit an affidavit addressing (1) when the air conditioning failed; (2) how hot it was or felt; (3) any physical difficulty or injury attributable to the heat; (4) availability of water, ice, and fans; (5) access to air-conditioned areas during the day; and (6) specific requests made to the defendants and the responses received. Twenty-two of the plaintiffs complied and their accounts

differed. Seven plaintiffs said they did not get ice. One acknowledged receiving ice once or twice per day while another was given ice four times daily. Five others reported not receiving "extra" ice, and the rest included in their affidavits multiple, though internally inconsistent, statements about the amount of ice they received. The plaintiffs gave similarly inconsistent reports about their access to the yard during the outage. Two said their access was limited while six others reported receiving extra yard access after the lawsuits had been filed. Most of the plaintiffs who responded, however, admitted receiving extra yard access.

The three plaintiffs who have appealed averred that the temperature in the facility was at least 80 degrees, though two said it sometimes broke 100 degrees. Rogers insisted he was allowed outside only one hour per day while Paige said he was given extra time outside during the last week of the outage. Rogers, who weighs 345 pounds and suffers from diabetes, high blood pressure, and a breathing disorder, recalled difficulty breathing during nighttime lockup. He also averred that he was not given "cold" water "or even kind words" and received extra ice only after deciding to sue. Swanson similarly denied getting ice. All three declared that they were constantly sweating and suffered skin sores and rashes as a result of the heat. They also recounted complaining to unnamed Rushville staff about the heat, but none of them described a specific complaint or request for accommodation made to one of the defendants.

To succeed on a claim of deliberate indifference under the Due Process Clause of the Fourteenth Amendment, the Rushville plaintiffs needed evidence demonstrating that (1) they were exposed to extreme cell temperatures that caused severe discomfort or created a risk of harm and (2) Rushville employees acted with deliberate indifference to those conditions. *See Sain v. Wood*, 512 F.3d 886, 893–94 (7th Cir. 2008); *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997). The plaintiffs would not have been required to show that the temperatures imminently threatened their health, *Del Raine v. Williford*, 32 F.3d 1024, 1035 (7th Cir. 1994), or that their plight was literally ignored, *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016). But they did have to show that the defendants were aware of sufficiently serious conditions yet intentionally or recklessly did nothing. *See id.*

In granting summary judgment for the defendants, the district court first concluded that the plaintiffs could not establish that they suffered a sufficiently serious deprivation despite the uncomfortably hot conditions. The court acknowledged the Supreme Court's admonishment that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v.*

*Romeo*, 457 U.S. 307, 321–22 (1982). But ultimately the district court reasoned that a high temperature of 85 degrees was not hot enough to trigger a constitutional violation, especially in light of our decision in *Sain*, 512 F.3d at 886. In that case a civilly detained sex offender was housed all summer in a room without air conditioning, and although the room had a window that opened, the window lacked a screen, allowing bees, wasps, and spiders to enter. *Id.* at 888–89. We concluded that those conditions were not serious enough to violate the Constitution. *Id.* at 894. And here, the court reasoned, the plaintiffs lacked air conditioning for only three weeks. They were "confined to their rooms only at night, when the outdoor air was cooler," the court said, and during the day, they had access to the outdoors and air-conditioned areas of the facility, could take showers, and were provided drinking water, ice, and medical care. The court thus concluded that the conditions, while uncomfortable, were not serious enough to violate the Constitution.

The court went on to consider, though, whether a jury could find that the defendants had been deliberately indifferent even assuming that the plaintiffs had suffered a sufficiently serious deprivation. In answering that question in the negative, the court explained that the Rushville residents had continuous access to water and, during daytime hours, use of the showers and dayroom, as well as their usual access to the yard and air-conditioned areas of the facility. The residents also had at least some access to ice (though the amount is a point of debate), and those who asked in writing for a fan received it. The court acknowledged the plaintiffs' argument that preexisting medical conditions put them at risk of harm. But only one of the many plaintiffs had asked for medical care during the outage, and he is not a party to this appeal.

The three plaintiffs who did appeal—Rogers, Paige, and Swanson— first argue that the district court denied them discovery. At no point did these plaintiffs submit an affidavit or declaration explaining that they lacked facts necessary to respond to the defendants' motion for summary judgment, nor did they request more time to respond. *See* FED. R. CIV. P. 56(d); *Kallal v. CIBA Vision Corp.*, 779 F.3d 443, 446–47 (7th Cir. 2015); *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 628 (7th Cir. 2014). When the district judge consolidated these lawsuits, she ordered the defendants to disclose relevant evidence, including the maintenance records for the air-conditioning system, the date they learned of a problem, the temperatures indoors and outside during the outage, the steps taken to repair the air conditioning and alleviate the residents' discomfort, complaints they received from residents and the responses from staff, and an explanation for not providing specific accommodations like allowing residents to sleep with their doors open or move into another air-conditioned area. The judge also allowed the plaintiffs to file individual responses to the motion for summary judgment, so each

had a chance to ask for further discovery. None of them did, making their contention that they were denied discovery frivolous.

Rogers, Paige, and Swanson also argue that the district court erred in concluding that they couldn't establish that they suffered a sufficiently serious deprivation, especially given Rogers's and Paige's preexisting medical conditions (diabetes, obesity, and breathing disorders). These impairments, they argue, made them more vulnerable to health complications caused by the excessive and prolonged heat. These plaintiffs further note that the internal temperature readings provided by the defendants—the highest being 85 degrees—do not account for the humidity, which was exacerbated by running the showers in the facility.

In responding to this argument, the defendants rely heavily on *Dixon*, 114 F.3d at 640, in which this court upheld the grant of summary judgment against an inmate on his claim that confining him in an unventilated cell during summer violated the Eighth Amendment. The inmate's cell was not air conditioned, but he did have a window that opened, a small electric fan, and the ability to open his chuckhole to create a cross breeze. The outage at Rushville, however, is readily distinguishable from the circumstances in *Dixon* and *Sain* because at Rushville the windows cannot be opened and the residents were not automatically given personal fans. *See Hinojosa v. Livingston*, 807 F.3d 657, 661–62, 664 (5th Cir. 2015) (recognizing that the complaint filed by the representative of a deceased inmate who suffered from hypertension, diabetes, depression, and schizophrenia stated an Eighth Amendment claim arising from the inmate's heat-related death in a Texas prison cell with sealed windows where the inside temperatures consistently exceeded 90 and even 100 degrees).

But the answer to this question cannot change the outcome for these plaintiffs because like the district court, we conclude that a jury could not find on this evidence that the defendants consciously disregarded the heat and its effects on the plaintiffs. It is undisputed that the defendants had been trying to repair the first compressor even before the failure of the second one caused all cooling to cease. It is also undisputed that Rushville's engineer concluded that the system could not be repaired without new compressors and notified the facility director, who immediately sought approval to purchase them at a cost of $20,000.

Beyond expediting this significant purchase, the defendants kept the ventilation system running, placed industrial-sized fans in the dayroom, and began leaving the outside door open at night to let cooler air into the unit. The defendants provided ice and residents had access to water at all times. During the day, residents could leave their

rooms, use the showers, go outside, and utilize the air-conditioned gym on a rotating basis. And while the plaintiffs contend that their lawsuits are what prompted Rushville staff to open the outside door at night and make extra ice and outdoor time available, we note that the timing of these accommodations also coincides with the spike in outdoor temperatures that first raised the indoor temperature above the middle 70s.

Finally, the defendants responded favorably to the few written requests from residents for accommodations and medical care. As the district court pointed out, only six residents submitted grievances relating to the heat, and only one of those six filed suit. That resident had asked to borrow a fan and promptly was given one. In contrast, Rogers, Paige, and Swanson assert that their medical issues make them especially vulnerable to the heat, but not one of them submitted a grievance or asked for medical care during the outage. And though each of them vaguely asserted in his discovery affidavit that he complained about the heat to Rushville staff, none of the three identified a specific need or request that was communicated to staff but ignored.

The judgment in each appeal is AFFIRMED.